**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DARCINDA TYUS, ET AL. | : | CIVIL CASE NO. |
| Plaintiffs, | : | 3:19-CV-01954 (JCH) |
| | : | |
| v. | : | |
| | : | |
| BERTERA SUBARU, ET AL. | : | OCTOBER 27, 2021 |
| Defendants. | : | |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**
**(DOC. NOS. 70, 71)**

**I.    INTRODUCTION**

Plaintiffs Darcinda Tyus ("Tyus") and her fiancé, Randy Norman ("Norman") bring this action under section 1982 of title 42 of the United States Code and the Connecticut Unfair Trade Practices Act ("CUTPA") seeking damages in connection with a dispute over a loaner vehicle.  The defendants are Bertera Subaru of Hartford, Inc. ("Bertera"), a Connecticut corporation; Rodney Gagnon ("Gagnon"), an officer of the Hartford Connecticut Police Department ("HPD"); and the City of Hartford ("Hartford").

Before the court are two Motions for Summary Judgment, one filed by Gagnon and the City of Hartford (Doc. No. 70) and the other by Bertera (Doc. No. 71).  For the reasons elaborated below, the court grants in part and denies in part both Motions.

1

II.     **BACKGROUND**

A.     Factual Background[1]

Tyus purchased a Nissan Sentra ("the Sentra") from Bertera in 2018. On July 19, 2019, she dropped the Sentra off at Bertera after hours for repairs.  The next day, July 20, Bertera provided Tyus with a loaner vehicle ("the Loaner"), for which Tyus signed a rental agreement (the "Rental Agreement").  See Rental Agreement (Doc. No. 77-5).

Two factual disputes color the parties' characterizations of this car exchange. First, the Rental Agreement stated that the Loaner was due back to Bertera on July 22, 2019, at 5:00 PM. See Rental Agreement. However, Tyus contends that a service advisor at Bertera told Tyus she could use the Loaner as long as the Sentra was under repair, orally modifying the contract.  Tyus' Local Rule 56(a)(1) Statement in Response to Bertera at ¶ 10 ("Tyus' L.R. Stmt. B.") (Doc. No. 77-1); Tyus' Aff. in Response to Bertera at ¶ 18 ("Tyus' Aff. B.") (Doc. No. 77-2); Tyus' Depo. at 47 (Doc. 71-2). Bertera denies any such modification. Bertera's Reply L.R. Stmt. at ¶ 10.

Second, the parties dispute the accuracy of the contact information Tyus provided to Bertera.  The parties agree that the Rental Agreement which Tyus signed listed an inaccurate phone number that Tyus had previously provided to Bertera. In addition, when she dropped off the Sentra, Bertera left "home" and "cell" numbers where she could be reached.  However, Bertera contends that these phone numbers did not belong to Tyus, Bertera's Local Rule 56(a)(1) Statement at ¶ 7 ("Bertera's L.R.

---

[1] Unless otherwise noted, the facts set forth in this section are not in dispute.

Stmt.") (Doc. No. 71-2), while Tyus avers that she wrote two numbers where she could be reached.[2]

Between July 20, 2019 and July 25, 2019, Bertera tried to contact Tyus more than twenty times by phone, text, and email.  On July 24, Bertera sent an email warning that the Loaner would be reported as stolen if Tyus did not respond.  Bertera Emails (Doc. No. 71-2). On July 25, 2019, at 10:56 AM, Bertera sent a final email to Tyus telling her that the Loaner had been reported stolen. Id.  The parties dispute whether the car had, in fact, been reported stolen when Bertera sent this email.  See Pls.' L.R. Stmt. B. at ¶¶ 17, 19; Bertera's Reply L.R. Stmt. at ¶¶ 17, 19.

At some point before 11:09 AM on July 25, 2019, Bertera contacted the Hartford Police Department about the missing Loaner. See Dispatch Summary Record (Doc. No. 77-7).  Norman and Tyus assert, and Bertera denies, that the dealership has an unwritten policy of calling the police on Black and Latino vehicle renters, who, like the plaintiffs, live in low-income neighborhoods.  See Pls.' L.R. Stmt. B. at ¶ 74; Bertera's Reply L.R. Stmt. at ¶ 74. In response to the call, Officer Gagnon drove to Bertera, where he spoke with Nick Dean, Bertera's Service Manager, who told him that the Loaner had not been returned.  While Officer Gagnon was at Bertera, Tyus called the dealership. Bertera asked Tyus to return the Loaner, and Tyus responded that she needed to consult a lawyer.  Tyus reached out to attorneys to seek advice. Plaintiffs' Local Rule 56(a)(1) Statement in Response to Hartford & Gagnon at ¶ 35 ("Pls.' L.R. Stmt. H.") (Doc. No. 76-1).

---

[2] Tyus reports that she left her daughter's cell number, Bertera's L.R. Stmt. at ¶ 13; Tyus' L.R. Stmt. B. at ¶ 13, and the home phone number of Norman's mother,who lives in an apartment unit in Tyus' house. Tyus' Aff. B. at ¶¶ 14-15; Bertera's L.R. Stmt. at ¶ 9.

3

After Tyus' call, Officer Gagnon left for Tyus' house. He parked his squad car, purposely blocking Tyus' driveway, Tyus' Aff. in Response to Hartford and Gagnon at ¶ 48 ("Tyus' Aff. H.") (Doc. No. 76-2), Norman's Aff. in Response to Hartford and Gagnon at ¶ 34 ("Norman's Aff. H.") (Doc. No. 76-3), Gagnon Depo. at 45 (Doc. No. 76-11), then approached the house and rang the doorbell.  Gagnon reports that Norman opened the door, and Gagnon asked for the keys to the Loaner. Hartford & Gagnon's Local Rule 56(a)(1) Statement at ¶ 7 ("Hartford & Gagnon's L.R. Stmt.").  Tyus and Norman contend that Gagnon, who was in uniform and armed, ordered Norman to retrieve the keys. Pls.' L.R. Stmt. H. at ¶ 7; Norman's Aff. H. at ¶¶ 24-35.  It is undisputed that Norman retrieved the keys from Tyus and handed them to Gagnon.  The plaintiffs, in their Statement of Facts uncontested by Hartford and Gagnon, elaborate that Gagnon remained parked outside of their home until around 12:45 PM, when several Bertera employees arrived.  Pls.' L.R. Stmt. H. at ¶¶ 53-54.  The plaintiffs' neighbors and family members witnessed the events, embarrassing Tyus and Norman.  Id. at ¶¶ 58-59.

Norman asked Gagnon for a case number, and Gagnon responded that no case number had been assigned, although the Police Department had assigned the incident a case number at 11:56 AM.  Id. at ¶ 55; Dispatch Summary Record.  Gagnon then ordered Norman to remove the Sentra from Bertera's lot. Id. at ¶ 56.

Shortly thereafter, the plaintiffs returned to Bertera to check on the Sentra. At Bertera, the plaintiffs contend, the general manager informed them that, because they had "threatened" Bertera with legal action, the Sentra would not be repaired and the plaintiffs should contact Bertera's legal counsel, Razmik Ghazarian. Pls.' L.R. Stmt. B. at ¶ 63; Tyus' Aff. B. at ¶ 60.  Bertera denies the plaintiffs' characterization of this

interaction. Bertera's Reply L.R. Stmt. at ¶ 63; Dean's Depo. at 15, 69-70; Ghazarian's

Depo. at 36-37. The plaintiffs called the American Automobile Association ("AAA") to

tow the Sentra from Bertera's lot, but AAA refused to tow the Sentra in its condition.

Pls.' L.R. Stmt. B. at ¶ 64; Tyus' Aff. B. at ¶ 60.

The Sentra thus remained at Bertera, and on August 1, 2019, Bertera began

charging increasing storage fees on the vehicle.  Pls.' L.R. Stmt. B. at ¶ 65; Bertera's

Reply L.R. Stmt. at ¶ 65.  The storage lien increased to approximately $3,350, which the

plaintiffs could not afford to pay.  Pls.' L.R. Stmt. B. at ¶ 67; Tyus Aff. B. at ¶ 68;

Bertera's Reply L.R. Stmt. at ¶ 67.  While the Sentra was on Bertera's property, the

plaintiffs assert, Bertera denied an inspector access to the vehicle because the

inspector lacked proof of certain insurance coverage.  Pls.' L.R. Stmt. B. at ¶ 66.

Furthermore, the plaintiffs represent that the Sentra remains on Bertera's lot because

they have not been able to find anyone willing tow the vehicle away. Id. at ¶ 69.  As a

result of not having the Sentra, her only means of transportation, Tyus lost her job. Pls.'

L.R. Stmt. B. at ¶ 70; Tyus Aff. at ¶ 71.

     B.    <u>Procedural Background</u>

          1.    The Plaintiffs' Causes of Action

The plaintiffs bring Count One against Gagnon under section 1983 of title 42 of

the United States Code, alleging that he acted under color of law to deprive the plaintiffs

of their Fourteenth Amendment due process rights.  Third Am. Compl. at ¶¶ 76-81

("Compl.").  In Count Two, which the plaintiffs bring against the City of Hartford under

section 1983, the plaintiffs allege that Hartford fails to train its officers to abstain from

aiding in private, self-help repossessions, or else that Hartford has an unwritten policy

permitting its officers to participate in such repossessions.  Id. at ¶¶ 82-88.  The

plaintiffs have abandoned their Count Three claim for trespass.  Pls.' Opp'n to Hartford & Gagnon at 24 ("Pls.' Opp'n H.") (Doc. No. 76).  Finally, the plaintiffs bring Count Four against Bertera alleging CUTPA violations.  Compl. at ¶¶ 91-96.

> 2.    The Defendants' Motions for Summary Judgment

The defendants move for summary judgment on all counts. As to Count One, Gagnon moves for summary judgment on the grounds that he did not deny the plaintiffs due process, and he is entitled to qualified immunity.  See Hartford & Gagnon's Mem. at 3-5, 7-8 (Doc. No. 70-1).  Hartford moves for summary judgment on Count Two, arguing that the plaintiffs have not established a Monell claim.  Id. at 6-7.  Likewise, Gagnon moves for summary judgment on Count Three, which the plaintiffs concede.  Id. at 8-9; see Pls.' Opp'n to Hartford & Gagnon at 24.  Bertera moves for summary judgment on Count Four on the grounds that CUTPA does not apply to Bertera's acts and, if it does, Bertera's conduct was not unfair or deceptive within the meaning of CUTPA.  Bertera's Mem. at 9-20 (Doc. No. 71-1).  Bertera further argues that Norman lacks standing to bring his CUTPA claims.  Id. at 20-21.

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.   DISCUSSION

### A.    Count One: Fourteenth Amendment Due Process (Gagnon)

The plaintiffs contend that Gagnon violated their Fourteenth Amendment due process rights by acting under the color of law to carry out a private self-help repossession on behalf of Bertera.  See Pls.' Opp'n H. at 11-17. Gagnon argues that he did not infringe upon the plaintiffs' rights because they had no property interest in the Loaner.  See Hartford & Gagnon's Mem. at 3-6.  The Second Circuit has made clear that individuals have a constitutional right "not to have property in which [they] enjoy[ ] a lawful possessory interest [repossessed] by state action in violation of the constitution." Barrett v. Harwood, 189 F.3d 297, 301 (2d Cir. 1999).  Here, genuine issues of material fact exist as to whether the Tyus had a possessory interest in the Loaner and as to whether Officer Gagnon's involvement constituted state action.

#### 1.    Lawful Possessory Interest

The Second Circuit has considered whether an individual who borrows a vehicle has a possessory interest in that vehicle, holding that a defendant driving a car he did not own had a possessory interest in the car when he "had a key" to the car as well as

"permission to use it" and "complete dominion and control over the car" "except with respect to the owner." See United States v. Ochs, 595 F.2d 1247, 1253 (2d Cir. 1979) cert. denied, 444 U.S. 955 (1979).  Furthermore, the Second Circuit has affirmed a district court decision holding an unauthorized driver of a rental vehicle had a "possessory interest in the vehicle" because a rental contract violation did not "rise to the level of criminal conduct, but merely provide[d] grounds for canceling the rental agreement. If the driver is authorized . . . to use the vehicle, the driver may legitimately conclude that the car is his during the time he has permission to use it." United States v. Little, 945 F. Supp. 79, 83 n.2 (S.D.N.Y. 1996) (discussing the possessory interest of an individual who was not listed as an authorized driver on the rental agreement but received permission from the car's lessee to drive the vehicle), aff'd, 133 F.3d 908 (2d Cir. 1998).  In Little, the District Court held that the "dominion and control" that a car's driver exercised over the vehicle, "resulting from the authority extended by the lessee, albeit in contravention of the terms of the contract, gives him a possessory interest in the vehicle." Id.; see also United States v. Cooper, 133 F.3d 1394, 1402 (11th Cir. 1998) (holding that, even where a rental contract has expired, an individual may retain sufficient "control and possession" over a rental car "for it to fall within the zone of constitutional sanctity").

Here, it is undisputed that Tyus had the keys to the car and that Bertera had authorized her to use the Loaner for a period of time under the Rental Agreement.  See Hartford & Gagnon's L.R. Stmt. at ¶ 2; Pls.' L.R. Stmt. H. at ¶ 2.  However, the parties dispute whether, when Gagnon arrived at the plaintiffs' home on July 25, 2019, the Rental Agreement continued to authorize Tyus to use the Loaner. Gagnon argues that,

because the Rental Agreement stated that the Loaner was due on July 22, 2019, "whatever permission or 'courtesy' was given to the Plaintiffs had expired before July 25, 2019", when he visited the plaintiffs' residence.  Hartford & Gagnon's Mem. at 5; Hartford & Gagnon's Reply at 2 (Doc. No. 82).  Tyus, on the other hand, contends that "Bertera's service advisor had told her that she could keep the Impreza until the repairs to the Sentra had been completed", extending her permission to use the Loaner beyond the time when Gagnon arrived at her home.  Pls.' Opp'n. H. at 11; Tyus Aff. at ¶¶ 18, 24, 27; see also Rental Agreement ("You may extend the Rental Period for up to one week if you obtain our consent before the date due . . . .").

Because a reasonable juror could find that Tyus was authorized to use the car and held possession and control over it, genuine issues of material fact exist as to whether Tyus had a possessory interest in the car.  The court therefore denies Bertera summary judgment on this ground.

As to Norman's possessory interest, the undisputed facts are such that no reasonable juror could find that he was authorized to use the Loaner. Although the Second Circuit has held that a driver who does not own a car may nonetheless maintain a possessory interest in the vehicle, the driver's interest hinges on his "dominion and control" over the vehicle due to his permission to use the vehicle and his possession of the keys.  See Ochs, 595 F.2d 1247 at 1253; see also, Little 945 F. Supp. 79 at 83 n. 2, aff'd, 133 F.3d 908.  In the instant case, however, Tyus had the key to the loaner when Gagnon arrived at the plaintiffs' residence, see Norman's Aff. H. at ¶ 32, and the plaintiffs have not alleged that Tyus gave Norman permission drive the car.  See Third Am. Compl.  In their Memorandum in Opposition to Hartford and Gagnon, the plaintiffs

argue that Norman maintained a possessory interest in the Loaner by virtue of the fact that his "belongings were in the Vehicle, and he benefitted from its short-term use through his relation with Tyus." See Pls.' Mem. at 17. Absent any allegations or evidence that Norman obtained permission from Bertera or Tyus to drive the car, however, the mere presence of his property in the car cannot confer a possessory interest in the vehicle. See, e.g., United States v. Michael, No. 1:18-CR-120-LJV-MJR, 2020 WL 6038844, at *7 (W.D.N.Y. May 22, 2020), report and recommendation adopted, No. 18-CR-120-V, 2020 WL 3989343 (W.D.N.Y. July 15, 2020) (holding that an individual had asserted no possessory interest where he claimed he had permission to place his bags and personal belongings in his co-defendant's car").

Because the record is devoid of any evidence that Norman had permission to drive the Loaner such that he exercised "dominion and control" over the vehicle, no reasonable juror could find that Norman had a possessory interest in the Loaner. The court therefore grants Gagnon's Motion for Summary Judgment as to Norman's due process claims, because no reasonable juror could find on the basis of the record evidence that Norman had a possessory interest in the Loaner.

2.    State Action

Material factual issues underlie the question of whether Gagnon's interactions with the plaintiffs constituted state action. In Barrett v. Harwood, 189 F.3d 297, the Second Circuit clarified when a police officer's involvement in a private repossession constitutes state action. Identifying a "spectrum" of police involvement ranging from "mere presence" to threatening arrest, the court noted that "[w]hen an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a

private repossession may cause the repossession to take on the character of state action."  Id. at 302 (collecting cases). The critical question, the court determined, is "whether the police officer was (1) present simply to stand by in case there was a breach of the peace, or (2) taking an active role that either affirmatively assisted in the repossession over the debtor's objection or intentionally intimidated the debtor so as to prevent him from exercising his legal right to object to the repossession."  Id. at 302-03.

In Barrett, a police officer did not physically assist in the repossession of a vehicle but made a comment suggesting he would arrest the plaintiff if he failed to cooperate with the repossession. Id. at 299-300.  These facts are distinct from those in the instant case, wherein Gagnon, who arrived at Tyus's residence before any of the Bertera employees, asked for and obtained the Loaner's keys from Norman. Here, both parties agree that Gagnon approached the plaintiffs' home and requested and received the keys.  Hartford & Gagnon L.R. Stmt at ¶ 8; Pls.' L.R. Stmt H. at ¶ 8.  The plaintiffs add that Gagnon arrived in his squad car before any Bertera employees, blocked the driveway, see Gagnon Depo. at 45, and approached the door in uniform and armed. See Norman Aff. at ¶¶ 24-35.  Gagnon offers no evidence contesting these assertions. A reasonable juror could determine, on the basis of this evidence, that Gagnon took an active role in affirmatively assisting Bertera in reclaiming the Loaner, giving the repossession "the character of state action."  See Barrett, 189 F.3d at 302.

Because genuine issues of material fact exist as to whether the Tyus had a possessory interest in the Loaner and whether state action occurred when Gagnon retrieved the Loaner's keys, the court denies Gagnon's Motion for Summary Judgment as to Tyus' claims that he violated her Fourteenth Amendment right to due process.

11

3.      Qualified Immunity

Gagnon argues that, even if he did violate Tyus' due process rights, he is entitled to qualified immunity.  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal citation and quotation marks omitted); see also Lennox v. Miller, 968 F.3d 150, 155 (2d Cir. 2020).  A right is clearly established if, "at the time of the challenged conduct . . . every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (internal citation and quotation marks omitted). To guide officials, a case need not have been decided directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id.  Relevant existing precedent includes Second Circuit and Supreme Court case law, as well as decisions from other Circuits that make a right's "contours . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right." Terebesi v. Torreso, 764 F.3d 217, 231 n. 2 (2d Cir. 2014).

Qualified immunity may also protect an official if it was objectively reasonable for that state actor to believe that his conduct did not violate a clearly established right.  Manganiello v. City of New York, 612 F.3d 149, 165 (2d Cir. 2010).  Whether an officer's conduct was objectively reasonable is a mixed question of law and fact.  Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007).  The court decides the ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, but "the factual questions must be resolved by the factfinder."  Id. at 368 (internal quotation marks and citation omitted).

12

Gagnon contends that "it was objectively reasonable for . . . [him] to believe he was not violating federal law by retrieving a vehicle that the Plaintiffs clearly did not own, lease, or pay any amount to rent." Hartford & Gagnon's Mem. at 7-8. First, the court notes that it is unclear from the record whether the plaintiffs "pa[id] any amount to rent" the Loaner. Indeed, the Rental Agreement states in a section entitled "Rental: Consideration" that Bertera "receives[s] compensation for this rental from the manufacturer for providing this courtesy rental to you; we also benefit from receiving your service business; and we receive goodwill, competitive advantage, name recognition, and other good and valuable consideration from this rental." Rental Agreement. Thus, the evidence, construed in the light most favorable to the plaintiffs, could support a reasonable juror's finding that the plaintiffs provided consideration in exchange for their rental of the Loaner.

Second, Gagnon argues that it is not clear from Second Circuit precedent that the law regarding "self-help repossession" applies where the plaintiffs did not own or lease the Loaner.  See Hartford & Gagnon Mem. at 7-8.  The Second Circuit has held that individuals have a "constitutional right not to have property in which they enjoy[ ] a lawful possessory interest repossessed by state action in violation of the constitution." Barrett, 189 F.3d at 301.  Barrett clearly establishes the principle that police involvement in a repossession raises constitutional concerns when someone has a lawful possessory interest in the repossessed property.

Here, genuine factual issues exist as to whether Tyus held a "lawful possessory interest" in the Loaner, triggering her constitutional right to avoid state-assisted repossession.  The Second Circuit has held that a person with the keys to a car,

"permission to use it" and "dominion and control over the car" has a possessory interest in the car.  Ochs, 595 F.2d at 1253 cert. denied, 444 U.S. 955.[3]  Here, Bertera granted Tyus permission to use the car by entering into the Rental Agreement.  While Gagnon argues that the Rental Agreement had expired by July 25, or, in essence, that Tyus no longer had permission to use the Loaner, issues of material fact remain as to whether Tyus had continuing permission to use the Loaner.

Even if Tyus did have continuing permission to use the Loaner, qualified immunity protects officials from suit over errors resulting from "a mistake of fact, or a mistake of mixed questions of law and fact." Pearson, 555 U.S. at 231.  So long as a defendant "has an objectively reasonable belief that his actions are lawful", he "is entitled to qualified immunity." Swartz v. Insogna, 704 F.3d 105, 109 (2d Cir.2013). Thus, if Tyus had permission to use the Loaner but Gagnon reasonably believed that she did not, qualified immunity might protect him from suit.  However, there is evidence

---

[3] The Second Circuit has expressly held that an individual in violation of a car rental agreement may nonetheless retain a possessory interest in the vehicle. See Little, 945 F. Supp. at 83 n. 2, aff'd, 133 F.3d 908 (unpublished decision).  While this non-precedential decision does not clearly establish the law in this Circuit, see Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001) ("A district court opinion affirmed by an unpublished table decision does not determine whether a right was clearly established"), the court notes the Little decision alongside the Second Circuit's decision in Ochs, 595 F.2d at 1253 cert. denied, 444 U.S. 955.

In addition, decisions reached by other Circuits may "reflect that the contours of the right . . . are clearly established", Terebesi v. Torreso, 764 F.3d at 231 n. 12.  The court observes that, outside of the Second Circuit, Courts of Appeals have held that individuals in lawful possession of a rental car do not automatically forfeit their possessory interests or their accompanying rights to due process when they violate the terms of a rental contract.  See Cooper, 133 F.3d at 1402 (holding that, despite an expired rental contract, an individual may retain sufficient "control and possession" over a rental car "for it to fall within the zone of constitutional sanctity"); United States v. Walton, 763 F.3d 655, 666 (7th Cir. 2014) (holding, where an individual drove without a license and breached a rental agreement, he "still had the authority to exclude anyone from the vehicle" and maintained a possessory interest); United States v. Henderson, 241 F.3d 638, 647 (9th Cir. 2000), as amended (Mar. 5, 2001) (finding a continued possessory interest where, "[e]ven though the rental agreement had expired, the parties to the agreement understood that [the individual] would retain possession and control of the car"); cf. United States v. Lyle, 919 F.3d 716, 729 (2d Cir. 2019), cert. denied, 140 S. Ct. 846, 205 L. Ed. 2d 470 (2020) (finding no privacy interest in a rental car where, unlike here, an individual's "possession and control of the car was unlawful the moment he started driving it").

in the record from which a reasonable juror could find not only that Tyus was authorized to use the Loaner, but also that Gagnon knew that Tyus was authorized.  The plaintiffs contend that Gagnon was present when Tyus told Bertera over the phone that a Bertera employee had granted her permission to use the Loaner until the Sentra had been repaired.  See Pls.' L.R. Stmt. B. at ¶¶ 30, 35; Bertera's Reply L.R. Stmt. at ¶¶ 30, 35; Gagnon Depo. at 36-39.  Moreover, in his deposition, Gagnon suggests that he was aware that the car was not stolen, stating that he was "strictly there to make sure that the car wasn't stolen and . . . knew that it wasn't stolen." Gagnon Depo. at 45-46.  He further acknowledges that "after knowing . . . that the car wasn't stolen . . . this was not a police matter" and that his "intent was to recover [Bertera's] car to prevent any problems." Id. at 65, 48.  In addition, he acknowledges that a rental car generally would not be classified as stolen under Connecticut law until the rental car company "follow[ed] up with a certified letter", id. at 63, which Bertera had not done.  See Conn. Gen. Stats. § 53a-119(10).  Thus, viewing the facts in the light most favorable to Tyus, a reasonable juror could find that Tyus was authorized to use the Loaner and that Gagnon was aware that she had permission to do so.  Any reasonable official with such knowledge would be aware that Tyus had a possessory interest in the vehicle.

Because the question of whether Gagnon is entitled to qualified immunity turns on genuine issues of material fact, the court denies Hartford and Gagnon's Motion for Summary Judgment with respect to Tyus' Fourteenth Amendment due process claims against Gagnon.

B.    Count Two: Monell Liability

The plaintiffs argue that Hartford should be held liable for (1) its alleged unwritten policy empowering officers to aid self-help repossessions or (2) its alleged failure to

15

train its officers to abstain from assisting in private repossessions.  <u>See</u> Compl. at ¶¶ 82-88.

A municipality may be sued under section 1983 if a plaintiff makes several showings, including "that an official policy of the municipality caused the constitutional injury." <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 36 (2d Cir. 2008) (citing <u>Monell v. Dep't of Soc. Services of City of New York</u>, 436 U.S. 658, 690–91 (1978)).   Here, the plaintiffs have offered no evidence that the City of Hartford had an official or unofficial policy allowing officers to engage in self-help repossessions.

However, a municipality may also be held liable for its failure to train police officers.  Such liability arises "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 (1989).   "Deliberate indifference is a stringent standard of fault and . . . necessarily depends on a careful assessment of the facts at issue in a particular case." <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011) (internal citations and quotation marks omitted).  To establish deliberate indifference underlying inadequate training, a plaintiff must show that (1) "a policymaker knows to a moral certainty that its employees will confront a given situation"; (2) that the "situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights." <u>Walker v. City of New York</u>, 974 F.2d 293, 297–98 (2d Cir.1992) (citations omitted).  A municipality will not be liable, therefore, if there was no "obvious need" for training, as "demonstrated through proof of repeated complaints of

civil rights violations; . . . followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." <u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir.1995).

Here, the plaintiffs have not come forward with evidence upon which a jury could find deliberate indifference, <u>see</u> <u>Cash</u>, 654 F.3d at 334, as they have provided no evidence that complaints have occurred and gone uninvestigated or unaddressed. Indeed, the record contains no evidence of any other complaints related to officer-attended self-help repossessions. <u>See, e.g.</u>, <u>Vann</u>, 72 F.3d at 1049.  In addition, Gagnon's alleged actions in this case—demanding the keys to the plaintiffs' vehicle when no breach of the peace or assault was at issue—are entirely inconsistent with a typical police response to maintain the peace at a private repossession, and no policymaker could have foreseen "to a moral certainty" that an officer would confront such a situation.  <u>See</u> <u>Walker</u>, 974 F.2d at 297.  Thus, no reasonable juror could find Hartford liable for a deliberately indifferent failure to train.

Accordingly, the court grants the City of Hartford's Motion for Summary Judgment with respect to the plaintiffs' claims against the municipality for civil rights violations under section 1983 and <u>Monell</u>.  436 U.S. 658.

C.   <u>Count Four: CUTPA Violation (Bertera)</u>

In their final count, the plaintiffs argue that Bertera violated CUTPA by acting deceptively and unfairly.  <u>See</u> Pls.' Opp'n to Bertera at 1 (Doc. No. 77).  Bertera contends, first, that Norman lacks standing to bring a CUTPA claim.  Bertera's Mem. at 20.  Second, Bertera suggests that CUTPA does not apply to its interactions with Tyus, because loaning cars is not Bertera's trade or practice as required under CUTPA.  <u>See</u> <u>id.</u> at 9-12.  Finally, Bertera argues that, if CUTPA does apply, then it did not act unfairly

17

or deceptively.  See id.  The court first addresses Norman's standing before turning to

the remainder of Bertera's arguments.

> 1.   Norman's Standing

Bertera contends that Norman does not have standing to pursue his CUTPA

claims against Bertera.  See Bertera's Mem. at 6-11.  With regards to standing to bring

a CUTPA claim, "CUTPA imposes no requirement of a consumer relationship."

Macomber v. Travelers Property and Cas. Corp., 261 Conn. 620, 643 (2002).  However,

"standing to bring a CUTPA claim will lie only when the purportedly unfair trade practice

is alleged to have directly and proximately caused the plaintiff's injuries." Soto v.

Bushmaster Firearms Int'l, LLC, 331 Conn. 53, 94, cert. denied sub nom. Remington

Arms Co., LLC, et al. v. Soto, 140 S. Ct. 513 (2019).  To determine whether a practice

has directly and proximately caused a plaintiff's injuries, the Connecticut Supreme Court

has undertaken a three-factor policy analysis:

> "First, the more indirect an injury is, the more difficult it becomes to
> determine the amount of [the] plaintiff's damages attributable to the
> wrongdoing . . . . Second, recognizing claims by the indirectly injured would
> require courts to adopt complicated rules apportioning damages among
> plaintiffs removed at different levels of injury from the violative acts . . . .
> Third, struggling with the first two problems is unnecessary whe[n] there are
> directly injured parties who can remedy the harm without these attendant
> problems."

Vacco v. Microsoft Corp., 260 Conn. 59, 89 (2002) (citation and internal quotation marks

omitted).

Under the first prong of the Vacco court's test, Norman's alleged injuries, losing

access to the Sentra and suffering financial harm, are indirect.  Norman's Aff. in

Response to Bertera at ¶¶ 5,7, 49, 51-53 (Doc. No. 76-3) (Norman's Aff. B).  Tyus, not

Norman, was the registered owner of the Sentra, id. at 52, and only Tyus entered into

the Rental Agreement for the Loaner.  <u>See</u> Bertera's L.R. Stmt. at ¶ 2.  Thus, Norman's

harms were derivative of Tyus's harms.[4]  The second factor also weighs against

allowing Norman to recover under CUTPA, as apportioning damages among consumers

and their indirectly injured partners, relatives, or family members would complicate

courts' assessments of CUTPA claims.  Finally, under the third factor, Tyus serves as a

directly injured party who can remedy the alleged harm imposed by Bertera and deter

further unfair practices.  <u>See, e.g.</u>, <u>Sotirio v. Washington Mut. Bank</u>, No.

CV010076451S, 2002 WL 31957490, at *4 (Conn. Super. Ct. Dec. 31, 2002) (applying

the three-factor test and finding that derivatively affected parties that did not enter into a

mortgage agreement could not recover where the directly affected mortgagor had the

right to bring an action).  Thus, all three factors weigh against permitting Norman to

pursue his claims. Therefore, the court grants Bertera's Motion for Summary Judgment

with respect to Norman's CUTPA claims.

### 2.    Trade or Practice

Bertera argues that its alleged conduct of loaning a vehicle to Tyus was not a

part of its trade or practice and, thus, is not subject to CUTPA.  <u>See</u> Bertera's Mem. at

2-3. CUTPA provides that "[n]o person shall engage in unfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Conn. Gen. Stat. § 42-110b(a). Under Connecticut law, "[w]hether the defendant is

subject to CUTPA is <u>a question of law</u>, not fact." <u>McCann Real Equities Series XXII,</u>

---

[4] Furthermore, while Norman asserts that he suffered "anxiety, mental anguish, and humiliation" due to his interaction with Gagnon, <u>see</u> Pls.' Opp'n. B. at 25, emotional harms do not constitute ascertainable losses under CUTPA. <u>See</u> <u>Di Teresi v. Stamford Health Sys., Inc.</u>, 149 Conn. App. 502, 512 (2014)

LLC v. David McDermott Chevrolet, Inc., 93 Conn. App. 486, 521 (2006) (emphasis in original) (citations omitted).  When applying CUTPA, Connecticut courts have held that "[a] CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce."  Id. at 523; see also Barbagallo v. Rob's Auto., No. CV 990494861S, 1999 WL 1241920, at *3 (Conn. Super. Ct. Dec. 3, 1999) ("[t]here is no viable claim under CUTPA when the practice complained of is incidental to the true trade or business conducted." (citing Brandewiede v. Emery Worldwide, 890 F.Supp., 79, 81, aff'd, 66 F.3d 308 (D.Conn.1994))).

Offering loaner vehicles is a part of Bertera's primary trade or business of servicing vehicles.  See Ghazarian Aff. at 5 (explaining that Bertera is in the business of "buying, selling, and servicing vehicles and manufacturer parts"); see also Tyus' Aff. at ¶¶ 21-26 (stating that Bertera loaned her a vehicle).  In his deposition, Nick Dean, the manager of Bertera's service department, testified that Bertera provides loaners to customers whose cars are being repaired "to enhance and facilitate repair services rendered to Bertera customers."  Id. at 17; Dean's Aff. at ¶ 7 (Doc. No. 83-1).  He further explained that the dealership has a "loaner fleet" along with a set of form contracts for customers who use the cars.  Dean's Depo. at 90-91 (Doc. No. 77-14).  Thus, Bertera loans cars as a part of the package of services it offers to customers.

Bertera's car lending practices are unlike the transactions described in several of the cases Bertera cites, which involve the sale of real estate by businesses engaged in other trades.[5]  Likewise, the case that, at first glance, seems most on point,

---

[5] See, e.g., Cornerstone Realty, Inc. v. Dresser Rand Co., 993 F.Supp. 107, 111– 12 (D.Conn.1998); Arawana Mills Co. v. United Technologies Corp., 795 F.Supp. 1238 (D.Conn.1992);

Brandewiede v. Emery Worldwide, 890 F.Supp. 79 (D.Conn.1994), is readily distinguishable upon closer examination.  In Brandeweide, the defendant, an air freight carrier, leased a plane in a deal unrelated to its primary freight business.  Id.  The court determined that the defendant was not in the trade or practice of leasing aircrafts. Id. at 81.  Here, by contrast, Bertera regularly loans vehicles to customers who are receiving car services, enabling and incentivizing those customers to patronize Bertera.  Thus, as a matter of law, Bertera's loaning of vehicles is a part of, and not merely incidental to, its primary trade or practice of servicing cars.  Accordingly, CUTPA applies to Tyus' claims against Bertera.

### 3.    CUTPA Unfairness

Bertera further argues that its practices were not unfair under CUTPA. To determine whether a practice is unfair under CUTPA, Connecticut courts apply the "cigarette rule." Votto v. Am. Car Rental, Inc., 273 Conn. 478, 484 (2005).  Under that rule, a practice may be unfair if it meets one or more of the following criteria:

> "(1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]"

Id.  Genuine issues of material fact exist as to whether the defendants' practices satisfy the first, second, and third prongs of the cigarette rule.  Under the first prong, whether the practice offends public policy, Tyus offers evidence that Bertera, at the very least, threatened to report the Loaner stolen despite the fact that, under Connecticut law,

---

McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc., 93 Conn. App. 486, 523 cert. denied, 277 Conn. 928 (2006); Biro v. Matz, 132 Conn. App. 272, 289 (2011).

failure to return a rental car does not amount to larceny unless notice is provided through certified mail under section 53a-119(10) of the Connecticut General Statutes. The record contains no evidence that Bertera sent Tyus a written demand by certified mail requesting the Loaner's return.

Bertera's conduct could also satisfy the rule's second prong, as, taken in the light most favorable to Tyus, the evidence is such that a juror could find that Bertera wrongfully called the police and accused Tyus of criminal activity.  See, e.g., Palmer v. Dots, LLC, No. HHDCV116020710S, 2014 WL 4494536, at *15 (Conn. Super. Ct. Aug. 4, 2014) (finding a genuine issue of material fact as to whether a store's manager engaged in an unfair or deceptive trade or practice when she accused the plaintiff of shoplifting to the police). Furthermore, Tyus offers the sworn statement of former Bertera employee Ronnie Bonner, attesting that Bertera has a discriminatory "unwritten policy" of contacting the police to report overdue rentals held by Black or Latino customers.  See Bonner's Aff. at ¶¶ 7-8 (Doc. No. 85).  While Bertera submits evidence that no such policy exists and that Bonner does not know the basis of Bertera's decision to contact the police about the missing Loaner, see Ghazarian's Supplemental Aff. at ¶¶ 6, 9 (Doc. No. 83-1), the conflicting evidence raises genuine issues of material fact properly resolved by a jury.

Finally, under the third prong, whether the practice causes substantial injury, Tyus offers evidence that she suffered financial harm stemming from the loss of her Sentra, Bertera's claimed storage lien on the Sentra, and, ultimately, the loss of her job. Tyus' Aff. B. at ¶¶ 70-74.  The defendants argue that Tyus could have avoided the alleged injury by providing accurate contact information.  Bertera's Mem. at 13-14.

Connecticut courts have held that, to satisfy the cigarette rule, an injury must be one that "consumers themselves could not reasonably have avoided." McLaughlin Ford, Inc. v. Ford Motor Co._, 192 Conn. 558, 569–70 (1984); see also Cadco, Ltd. v. Doctor's Assocs., Inc._, 188 Conn. App. 122, 141–42 (2019).  Here, however, genuine issues of material fact exist as to the phone numbers that Tyus left for Bertera as well as Bertera's attempts to contact Tyus.  Thus, at this stage, there are material issues of fact in dispute requiring a jury to determine whether Tyus could have reasonably avoided the injury.

A defendant's actions need not violate every prong to constitute unfair conduct under the cigarette rule.  "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." See Votto, 273 Conn. at 484**.**  Here, genuine issues of material fact exist as to each of the rule's three criteria and, therefore, as to whether the defendants committed unfair acts or practices in violation of CUTPA.

### 4.    CUTPA Deception

Finally, Bertera contends that its acts were not deceptive within the meaning of CUTPA.  To determine whether an act or practice is deceptive under CUTPA, Connecticut courts consider three factors:

> "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct."

Cadco, Ltd._, 188 Conn. App. at 142 (quoting Caldor, Inc. v. Heslin, 215 Conn. 590, 597 (1990), cert. denied, 498 U.S. 1088 (1991)).  "[A] party need not prove an intent to

deceive to prevail under CUTPA." Cadco, Ltd., 188 Conn. App. at 142 (internal citation omitted).

Here, Tyus has offered evidence that Bertera's representatives made two representations likely to mislead her: (1) that Tyus could use the Loaner until the Sentra had been repaired, Tyus Aff. B at ¶¶ 24, 27, and (2) that Bertera had reported the Loaner stolen and intended to pursue criminal prosecution. Tyus Aff. at ¶ 40; Bertera Emails (Doc. No. 77-6). Bertera disputes both assertions. Bertera contends that Tyus was required to return the Loaner on the Rental Agreement's prescribed July 22, 2019 return date and denies that an employee's statement modified the Agreement to allow for a later return. See Bertera's Reply to Tyus's L.R. Stmt. B. at ¶ 10 ("Bertera's Reply") (Doc. No. 83-1). Bertera also argues that its representatives had indeed contacted the Hartford Police Department around 11:00 AM on July 25, 2019, before emailing Tyus to inform her that the Loaner had been reported stolen. Bertera's Reply at 4; Bertera's L.R. Stmt. at ¶ 38. However, Tyus has submitted evidence that Bertera emailed her at 10:56 AM, before Bertera contacted the police. See Bertera Emails. Furthermore, Tyus raises questions as to whether Bertera ever reported the vehicle as stolen, as the police dispatch report states only that the "customer hasn't returned their loaner car." Dispatch Summary Record.

Each of Bertera's representations, if substantiated, could have been reasonably interpreted by Tyus and affected her conduct, constituting a deceptive act under CUTPA. However, the genuine issues of material fact surrounding these representations are properly resolved by a jury and not at the summary judgment stage. Bertera's Motion for Summary Judgment is therefore denied as to Tyus' CUTPA claims.

**V.      CONCLUSION**

For the reasons elaborated above, the court grants Hartford and Gagnon's Motion for Summary Judgment (Doc. No. 70), in part, as to Norman's Fourteenth Amendment due process claims against Gagnon in Count One, the plaintiffs' section 1983 claims against the City of Hartford in Count Two, and the plaintiffs' trespass claims against Gagnon in Count Three.  The court denies Hartford and Gagnon's Motion for Summary Judgment as to Tyus' Fourteenth Amendment due process claims against Gagnon in Count One.  The court grants in part Bertera's Motion for Summary Judgment (Doc. No. 71) as to Norman's CUTPA claims against Bertera in Count Four, dismissing Norman's claims for a lack of standing.  The remainder of Bertera's Motion for Summary Judgment, as to Tyus's CUTPA claims in Count Four, is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 27th day of October 2021.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge